W. H. McElwain Company, Appellant, *v.* Luigi Primavera, Respondent.

First Department, November 23, 1917.

Guaranty and suretyship — corporations — merger under Stock Corporation Law, section 15 — right of corporation formed by merger to enforce written guaranty to corporation merged.

Where, after a written instrument had been executed and delivered to a corporation guaranteeing the payment at maturity of any and all purchases from and after the date thereof, made by or in the name of a certain person, said corporation was merged with another corporation pursuant to section 15 of the Stock Corporation Law, the company formed by the merger stands in the place of those merged and is entitled to enforce the guaranty.

Under said section of the Stock Corporation Law, nothing is lost by a merger and the company formed thereby stands in the place of those merged and any right which belonged to them may be asserted by it " without change or diminution."

Scott, J., dissented, with opinion.

Appeal by the plaintiff, W. H. McElwain Company, from a judgment of the Appellate Term of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 4th day of April, 1917, affirming a judgment of the Municipal Court of the City of New York, Borough of Manhattan, First District.

*M. N. Thayer*, for the appellant.

*Marshall Snyder*, for the respondent.

Clarke, P. J.:

The facts are stated in the opinion of my brother Scott, but he does not, I think, give due effect to the statute (Stock Corp. Law [Consol. Laws, chap. 59; Laws of 1909, chap. 61], § 15) providing for the merger of corporations, which provides: " * * * Thereupon it shall acquire and become, and be possessed of all the estate, property, rights, privileges and franchises of such other corporation, and they shall vest in and be held and enjoyed by it as fully and entirely and without change or diminution as the same were before held and enjoyed by such other corporation, and be managed and controlled by the board of directors

of such possessor corporation, and in its name, but without prejudice to any liabilities of such other corporation or the rights of any creditor thereof." It seems to me that under this statute nothing is lost by a merger; that the company formed by the merger stands in the place of those merged, and any right which belonged to them can be asserted by it — " it shall acquire and become, and be possessed of all the estate, property, rights, privileges and franchises of such other corporation, * * * without change or diminution."

In *Matter of Bergdorf* (206 N. Y. 309) testator had executed his will November 2, 1904. He appointed as executors thereof and trustees of the trusts created two individuals and the Morton Trust Company," and the survivors and successors of them." He died January 11, 1911, and his will was probated February 28, 1911. On January 27, 1910, the Morton Trust Company was merged into the Guaranty Trust Company under and in the manner provided in sections 36 to 40, inclusive, of the Banking Law (Consol. Laws, chap. 2; Laws of 1909, chap. 10). The surrogate issued letters testamentary to the individuals named in the will, but denied the petition of the Guaranty Trust Company for the issuance of such letters to it. The Court of Appeals said: " Within the regulations and restrictions prescribed by law, a testator may commit the custody and administration of his estate to such executor or executors as he pleases, and his selection and designation alone it is which invests them with authority and power. The letters testamentary, founded upon the probate of the will, neither create the executor nor confer title or power upon him. * * * The testator in making the will and appointing the executors was and remained throughout the following years of his life subject to the relevant existing statutes. The right to make a testamentary disposition of property is not an inherent right; nor is it a right guaranteed by the fundamental law. Its exercise to any extent depends entirely upon the consent of the Legislature as expressed in their enactments. * * * A testator intends and must be deemed to intend the results which the operation of those rules produce. They affect the testamentary disposition and provisions as though embodied in the will; and in case the cited sections of the Banking Law

provide that the merger of the Morton Company transferred to the Guaranty Company the right, privilege or interest, if any, which the designation of it as an executor originated, and thereby entitled the latter to the executorship, thus it was that the testator intended. In reading the sections we do not regard the intention of the testator, but that of the Legislature. Their language is broadly and conspicuously comprehensive. The merger transferred to the Guaranty Company ' all and singular the rights, franchises and interests of ' the Morton Company ' in and to every species of property, real, personal and mixed, and things in action thereunto belonging ' and empowered the Guaranty Company to ' hold and enjoy the same and all rights of property, franchises and interests in the same manner and to the same extent ' as the Morton Company would if it ' should have continued to retain the title and transact the business of ' the Morton Company. This language means not only that every right, privilege, interest or asset of conceivable value or benefit then held by the Morton Company (except the right to be a corporation) should pass into and be absorbed by the Guaranty Company, but also that every right, privilege, interest or asset of conceivable value or benefit then existing which would inure to the Morton Company under an unmerged existence should inure to the Guaranty Company. Nothing appertaining to the Morton Company was to be lost, forfeited or destroyed. The designation of the Morton Company as an executor created a privilege or an interest in the estate of the testator appertaining to that company  *  *  *. It existed, although in an incomplete, imperfect and dependent condition, from the making of the will and at the time the merger of the Morton Company was consummated. Ignorance on the part of the Morton Company of its existence did not affect it. Through it that company would have been an executor and entitled to the letters testamentary if it had ' continued to retain the title and transact the business of such corporation.' The merger transferred it to the Guaranty Company and in effect substituted that company for the Morton Company. The Guaranty Company was entitled to hold and enjoy it even as would the Morton Company under an unmerged existence. By virtue of the statute, effective as a part of the

will, the Guaranty Company was designated as an executor and as such is entitled to receive the letters testamentary."

In *City National Bank of Poughkeepsie* v. *Phelps* (86 N. Y. 484; 97 id. 44) a continuing guaranty dated February 15, 1861, had been given to the City Bank of Poughkeepsie: " We hold ourselves responsible for the payment of any sum not to exceed five thousand dollars ($5,000) Mr. C. H. Woodruff may require of your bank for legitimate business purposes." The City Bank was organized as a State bank August 30, 1860. It was converted into the City National Bank in June, 1865. A note for $2,000 had been discounted for Woodruff by the City National Bank July 26, 1869, after the reorganization, which had been reduced by payments and renewed from time to time down to January 17, 1876, when the last renewal was given for $1,400, payable four months after date. The point raised was that the City National Bank could not hold the defendant upon the obligation to the City Bank; that the plaintiff was a distinct corporation from the State City Bank; that they are separate parties, and that the obligation of a surety to one party may not be availed of by another party. Judge RAPALLO, writing for a unanimous court, affirming a judgment for the plaintiff, said: " The general scheme of the National Banking Act* is that State banks may avail themselves of its privileges and subject themselves to its liabilities, without abandoning their corporate existence, without any change in the organization, officers, stockholders, or property, and without interruption of their pending business or contracts. All property and rights which they had before organizing as National banks are continued to be vested in them under their new status. Great inconveniences might result if this saving of their existing assets did not include pending executory contracts, and pending guarantees, as well as vested rights of property. Although, in form, their property and rights as State banks purport to be transferred to them in their new status of National banks, yet in substance there is no actual transfer from one body to another, but a continuation of the

---

* See 13 U. S. Stat. at Large, 99, 100, chap. 106, § 5 *et seq.;* Id. 112, § 44; U. S. R. S. § 5133 *et seq.;* Id. § 5154.— [REP.

same body, under a changed jurisdiction. As between it and those who have contracted with it, it retains its identity, notwithstanding its acceptance of the privilege of organizing under the National Banking Act."

That case was cited in *Michigan Insurance Bank* v. *Eldred* (143 U. S. 293, 300) and the *Bergdorf Case* (*supra*), and quoted from and followed in *People* v. *Backus* (117 N. Y. 196). That case was an action against defendants as guarantors that the National Bank of Auburn would fully perform its contracts to the People to pay over on demand all moneys of the State deposited with it by the agent and warden of Auburn Prison. The bank was incorporated under the National Bank Act of 1863 (12 U. S. Stat. at Large, 665, 666, chap. 58, § 5 *et seq.*), and by its articles of association it was provided that it should continue until February 25, 1883. By the act of Congress passed July 12, 1882 (22 U. S. Stat. at Large, 162, chap. 290) National banks were authorized to extend their corporate existence, and in January, 1883, such proceedings were taken under that act as to extend the charter of the bank and its corporate existence until February 24, 1903. By section 4 of the act it is provided that "any association so extending the period of its succession shall continue to enjoy all the rights and privileges and immunities granted and shall continue to be subject to all the duties, liabilities and restrictions imposed by the Revised Statutes of the United States and other acts having reference to National banking associations, and it shall continue to be, in all respects, the identical association it was before the extension of its period of succession." (22 U. S. Stat. at Large, 163, § 4.) The action was for moneys deposited with the bank after 1883, and down to 1888, it having become insolvent. When the guaranty was executed the existence of the bank was limited to the year 1883, and hence liability for moneys deposited with it was limited to that period. But the limitation was extended by act of Congress for twenty years further, of course without the consent of the guarantor. Nevertheless, Judge Earl, writing for a unanimous court, said: "Here a new corporation was not formed, but there was a mere prolongation of the existence of the same corporation whose corporate identity was not changed or lost. The bank which defaulted

was the same bank for which the defendants became bound. There were not two banks in succession, but all the time one bank. Its charter was amended so as to extend its existence; and in the original National Banking Act (§ 67)* it was provided that Congress could, at any time, ' amend, alter or repeal this act.'. It would certainly be a very inconvenient rule to hold that all the contracts of sureties to the bank, and of sureties by the bank to other persons, should be destroyed by every material change or alteration in its charter. The contract was entered into by the sureties with knowledge of this law, and it became a part of their contract as if they had stipulated that the changes or alterations might be made." In *Bank of Long Island* v. *Young* (101 App. Div. 88) the plaintiff was a domestic banking corporation. On January 1, 1903, under and pursuant to the Banking Law (Gen. Laws, chap. 37 [Laws of 1892, chap. 689], §§ 34–38, added by Laws of 1895, chap. 382, as amd. by Laws of 1900, chap. 199), the Bank of Jamaica became and was merged in the plaintiff. In November, 1900, the defendant in writing guaranteed and promised to be answerable to the Bank of Jamaica for the payment of loans which it might thereafter make to the National Cooperage Company to the extent of $10,000 and to William R. Cole & Co. to the extent of $5,000. On the faith of said guaranty the Bank of Jamaica loaned the said National Cooperage Company and said firm of William R. Cole & Co. $15,000. Said sums became due on July 1, 1903, after the merger, and being unpaid, this action was brought against defendant as guarantor. The court said: " ' Dealing with the original banking corporation, the defendant subjected himself to the possibility of merger and the enforcement of the contract by the new corporation, which is new so far as the defendant is concerned in name only.' The provisions of section 37 of the Banking Law * * * regulating the transfer and the vesting of property in a case where merger occurs, are very broad. The Legislature did not contemplate that the property of one bank merged in another should vest in the corporation in which the merger takes place by operation of any assignment, or that such transfer should be

---

* 12 U. S. Stat. at Large, 682, § 65; 13 id. 118, § 64.— [REP.

attended with the usual rules of law in respect to assignments. The scheme is that the corporation which is merged with another should lose its identity only so far as its separate existence is concerned, and that it should be swallowed up in the other and become an integral part thereof, carrying into the corporation which survived all its rights, powers, liabilities and assets, except the indicia and attributes of a corporate body, distinct from that into which it is merged. * * * So far as the relations of this defendant with the plaintiff are concerned in this transaction, they are by virtue of the statute the same as though for the purpose of determining the obligations of the defendant upon his guaranty, the Bank of Jamaica had existed a separate and distinct corporation, managed and operated by the officers and directors of the plaintiff. Such was clearly the intention of the Legislature in the enactments in relation to mergers, even though the language of section 37 of the Banking Law may, as the appellant here claims, be insufficient to vest title in the cause of action sued upon, by assignment, by reason of some subtle intricacies of the law of assignment."

In my opinion the foregoing cases completely answer the arguments contained in the dissenting opinion. The defendant gave his guaranty to a corporation charged with the knowledge that the law permitted the merger of that corporation with another, and the vesting in the merged corporation of all the " estate, property, rights, privileges and franchises " belonging to its component parts. There was no assignment of the guaranty, none was made, none was required by law. By the merger it belongs to the merged corporation and is effectual.

The determination of the Appellate Term should be reversed, with costs and disbursements in this court and at the Appellate Term to the appellant, and the judgment of the Municipal Court reversed and a new trial ordered, with costs in that court to abide the event.

Smith and Shearn, JJ., concurred; Scott, J., dissented.

Smith, J. (concurring):

Defendant gave to Morse & Rogers, a corporation, a continuing guaranty that one Henry would pay for any goods

purchased by him of said corporation from and after the date of the guaranty. Subsequently, Morse & Rogers merged into and ·became a part of the plaintiff corporation, which thereafter, on the faith of this guaranty, sold goods to the said Henry, for which he failed to pay, and to recover for which the action is brought. Judgment was given in behalf of the defendant and unanimously affirmed by the Appellate Term. This appeal is from the order of affirmance.

The merger took place under section 15 of the Stock Corporation Law (Consol. Laws, chap. 59; Laws of 1909, chap. 61), which provides that the corporation into which a merger is effected shall thereafter " acquire and become, and be possessed of all the estate, property, rights, privileges and franchises of such other corporation, and they shall vest in and be held and enjoyed by it as fully and entirely and without change or diminution as the same were before held and enjoyed by such other corporation." At the time of the giving of the guaranty this section was in force, and the guaranty must, therefore, be considered to have been given in contemplation of a possible merger of the corporation.

The language of the section is very broad and comprehensive, and the construction put upon it by the courts is a liberal one. It has been held that in case of a merger there is no question of dissolution, termination or break, but a continuance as an integral part of a whole, with the ownership in the whole of all and every right and privilege possessed by the part. (*Matter of Bergdorf,* 149 App. Div. 529; affd., 206 N. Y. 309.) In that case it was held that where a corporation was appointed trustee under a will and, prior to the death of the testator, merged into another corporation, the latter became entitled on the testator's death to act as trustee, the court saying it was not the intent of the testator that governed, but that of the Legislature, and (referring to section 15 of the Stock Corporation Law) holding: " This language means not only that every right, privilege, interest or asset of conceivable value or benefit then held by the Morton Company (except the right to be a corporation) should pass into and be absorbed by the Guaranty Company, *but also that every right, privilege, interest or asset of conceivable value or benefit then existing which would inure to the*

First Department, November, 1917. [Vol. 180.

*Morton Company under an unmerged existence*, should inure to the Guaranty Company. Nothing appertaining to the Morton Company was to be lost, forfeited or destroyed."

There was no personal equation in so far as the original corporation was concerned, since its entire directorate and management might be changed without affecting the guaranty. Its entire capital stock might have changed hands and the policies of the company have been materially altered, so that a reliance on the discretion and prudence of the person extending the credit could not, as suggested in the dissenting opinion, have been a material consideration in making the contract of guaranty. The principle seems no different from that involved in the case of a fidelity bond for the performance of services, in which class of cases it is held that the bond inures to the benefit of the corporation in which a merger has been effected. (*Lee* v. *Atlantic Coast Line R. Co.*, 150 Fed. Rep. 775, 787; *Miller* v. *Lancaster*, 45 Tenn. 514; *Pennsylvania & N. R. R. Co.* v. *Harkins*, 149 Penn. St. 121.) There would seem to be just as much reason for claiming a reliance on the discretion and prudence of the particular employer as of the person extending the credit.

The case of *Bennett* v. *Draper* (139 N. Y. 266), cited in the dissenting opinion as an authority against the continuing of the guaranty after the merger, was a case where the guaranty was given to a copartnership. One of the members of this copartnership died, causing a dissolution, and a new partnership was formed. It was held that the guaranty did not survive the dissolution and hence did not inure to the benefit of the new firm. That case is distinguishable from the case at bar upon two grounds: *First*, the death of a partner dissolves the partnership as matter of law, of which the obligor presumably had knowledge. *Secondly*, the contract of a surety with a copartnership has presumably a personal element, resting in the confidence of the surety in the judgment and discretion of the partnership. This was recognized as a controlling factor in the case cited, and in the opinion it is said: " Her obligation is limited to loans made by the firm, *which it may be presumed she knew*, and with which alone she had contractual relations." A contract of a surety with a corporation, however, can have no personal element, as before stated, because of the liability

of a corporation to change its officers, its directors and even its stockholders at any time. The question asked in the opinion in *Pennsylvania & N. R. R. Co.* v. *Harkins (supra)* is very pertinent. The learned judge, discussing the liability of a surety upon the bond given to a corporation which had thereafter been merged, said: " Admitting, for the sake of argument, that the old companies were at once dissolved and a new company created by the act of merger, How are the sureties injuriously affected by this consolidation or merger? "

The precise question here has apparently not heretofore been before the courts. It would seem, however, to have been the intention of the Legislature that nothing should be lost by the merger of corporations, and applying the liberal construction given by the courts in analogous cases involving this section, I am of the opinion that the order of the Appellate Term and judgment of the Municipal Court should be reversed and a new trial granted.

Clarke, P. J., and Shearn, J., concurred.

Scott, J. (dissenting):

On January 14, 1910, the defendant executed and delivered a written guaranty to the corporation of Morse & Rogers, whereby he guaranteed " the payment at maturity of any and all purchases from and after the date thereof, made by or in the name of H. Henry." It was expressly agreed that the guaranty was to be a continuing one, covering all future purchases of goods until notice of revocation. Notice of sale, delivery of goods, non-payment at maturity, extensions and indulgences were waived.

The corporation of Morse & Rogers sold goods to the said H. Henry until March, 1913, when it became merged with the plaintiff, also a corporation. Plaintiff continued to sell goods to said H. Henry until May, 1915, when he failed to pay for the goods purchased and a judgment was recovered against him which remains unpaid. Plaintiff sues upon the above-described guaranty, and the question involved is whether such guaranty survived the merger of Morse & Rogers with plaintiff and may be enforced by the latter.

The merger took place under section 15 of the Stock Cor-

poration Law, which reads as follows: " Any domestic stock corporation and any foreign stock corporation authorized to do business in this State lawfully owning all the stock of any other stock corporation organized for, or engaged in business similar or incidental to that of the possessor corporation may file in the office of the Secretary of State, under its common seal, a certificate of such ownership, and of the resolution of its board of directors to merge such other corporation, and thereupon it shall acquire and become, and be possessed of all the estate, property, rights, privileges and franchises of such other corporation, and they shall vest in and be held and enjoyed by it as fully and entirely and without change or diminution as the same were before held and enjoyed by such other corporation, and be managed and controlled by the board of directors of such possessor corporation, and in its name, but without prejudice to any liabilities of such other corporation or the rights of any creditors thereof. Any bridge corporation may be merged under this section with any railroad corporation which shall have acquired the right by contract to run its cars over the bridge of such bridge corporation."

There has been much discussion of the effect of a merger of corporations, and a distinction has frequently been drawn between a merger and a consolidation. (See *Matter of Bergdorf*, 149 App. Div. 529, 532, and cases there cited.) In the view which I take of the question under consideration it is not necessary to pursue that discussion. Certainly the language of the statute quoted above is as strong as could have been devised to effect a devolution or transfer to the resultant corporation of all property and rights of every description capable of transference from one corporation or person to another. But there are certain things which even the Legislature may not do by any language however strong. It may not make a contract for an individual, and may not extend the operation of a contract beyond the fair intendment of the individual who made it and who is to be bound by it. Hence it cannot by statute work the assignment or transference of a contract which is in its nature unassignable. The contract of guaranty has generally been considered to be such a contract. It has always been held to be *strictissimi*

*juris.* The guarantor is entitled to determine for himself the terms of his guaranty as to extent, terms and the person for whom, as well as the person to whom the guaranty shall run, and he is entitled to insist that his obligation shall not be enlarged in any direction or to any extent without his assent. It is of no consequence whether or not he is or may be harmed by the deviation to which he has not assented. (*Barns* v. *Barrow,* 61 N. Y. 39.) The person to whom the guaranty is given is quite as important as the person who is guaranteed. In the case just cited Commissioner DWIGHT remarks that in case of a guaranty of credit the guarantor may be presumed to have relied upon the prudence and discretion of the person to whom the guaranty is given and who is to extend the credit, quoting the ancient case of *Philip* v. *Melville* (15 F. C. 204), cited in Burge on Suretyship (at p. 68). Accordingly, in *Barns* v. *Barrow* (*supra*) a guaranty of performance by one Barrow to sell on commission and to account for goods consigned to him by John W. Barns was held not to apply to goods consigned to Barrow by a firm of which John W. Barns was a member, it appearing that neither the defendant, the guarantor, nor Edward F. ·Barrow for whom he became surety knew that the goods were to be consigned by the firm and not by John W. Barns personally.

So, also, in *Bennett* v. *Draper* (139 N. Y. 266) the action was upon a guaranty given by the defendant to guarantee the firm of H. C. Bennett & Co. the repayment of any moneys, up to a certain sum, advanced by that firm to the copartnership of John H. Draper & Co. Hiram C. Bennett, one of the members of the obligee firm died, but the business was continued under the same firm name, and with partners having the same individual names. It was held that the guaranty did not survive the change in the firm and that the new firm could not recover upon it for advances made to Draper & Co., upon the ground that the contract of guaranty was incapable of assignment without the consent of the guarantor. It is quite clear that the contract here sued upon could not have been assigned by Morse & Rogers to the plaintiff corporation, and I am of the opinion that it was equally incapable of transference by act of the Legislature. I can find nothing to the contrary in *Matter of Bergdorf* (206

N. Y. 309). In that case it appeared that one Bergdorf had made a will by which he nominated the Morton Trust Company as one of his executors. After the will was made, but before the death of the testator, the Morton Trust Company was merged into the Guaranty Trust Company under the provisions of sections 36 to 40, inclusive, of the Banking Law (Consol. Laws, chap. 2; Laws of 1909, chap. 10). The question presented was as to the right of the latter company to receive letters testamentary. In the Court of Appeals it was claimed by the Guaranty Trust Company that the Morton Trust Company still existed but as a part of the Guaranty Trust Company and that the two corporations were identical. The court refused to take this view, holding that the Morton Trust Company still remained an independent corporation, but with very limited powers and that its rights, franchises and interests in and to every species of property, real, personal or mixed and things in action being transferred to and vested in the Guaranty Trust Company by virtue of the merger statute which in effect, although not in identical language, is similar to the statutory provisions for the merger of stock corporations. It was also held that the designation of the Morton Trust Company as executor created an inchoate interest or privilege appertaining to that company, and this, it was considered, passed to the Guaranty Trust Company by the terms of the merger act. It was pointed out by the court that such a transference was within the power of the Legislature because " The right to make a testamentary disposition of property is not an inherent right; nor is it a right guaranteed by the fundamental law. Its exercise to any extent depends entirely upon the consent of the Legislature as expressed in their enactments. It can withhold or grant the right, and if it grants it, it may make its exercise and its extent subject to such regulations and requirements as it pleases. It may declare the rules under which the administration of the estate may be committed to executors and make compliance with them mandatory." It can readily be seen that this reasoning has no application to a case in which it is sought to extend the operation of a contract of guaranty beyond its clear import, thus altering to an extent the contract.

In *City National Bank of Poughkeepsie* v. *Phelps* (97 N. Y.

44) the question was whether a continuing guaranty of credit given to the City Bank while a State institution inured to the benefit of the same institution after it had become a National bank. It was held that it did because: "Although, in form, their property and rights as State banks, purport to be transferred to them in their new status of National banks, yet in substance there is no actual transfer from one body to another, but a continuation of the same body, under a changed jurisdiction. As between it and those who have contracted with it, it retains its identity, notwithstanding its acceptance of the privilege of organizing under the National Banking Act." Thus the contract of guaranty was held to survive the change from a State bank to a National bank because there was no actual change in the obligee, and consequently no extension of the obligor's contract. So in *People* v. *Backus* (117 N. Y. 196) there was no change in the person of the obligee, but merely an extension of its term of life.

There are expressions in *Bank of Long Island* v. *Young* (101 App. Div. 88) which are favorable to the contention of the plaintiff here, but they were not essential to the decision of the case, which went on another ground.

There is a certain class of cases, in which what may be termed fidelity bonds are given, to which a different rule might well be applied. Such was *Pennsylvania & N. R. R. Co.* v. *Harkins* (149 Penn. St. 121). That case involved a bond given to insure the faithful performance by a railroad employee of his services as such, and it was held that the benefit of the bond extended to the corporation with which the original employer was merged. In that case it could make no possible difference to the insurer in whose employ the insured was, providing the duties to be performed by him were not materially altered or his responsibilities increased. But where the guaranty is of credit it is of material importance to the guarantor not only to whom the credit is extended, but also by whom it is to be extended, for as already said he is entitled to rely upon the discretion and prudence of the person whom he selects as the one to extend the credit.

Upon principle I am of the opinion that the merger of Morse & Rogers with plaintiff did not operate to transfer or extend defendant's obligation to plaintiff so as to cover

credits extended to H. Henry after the merger had been affected.

It follows that the determination of the Appellate Term should be affirmed, with costs.

Determination reversed, with costs in this court and in the Appellate Term to the appellant; judgment of Municipal Court reversed and new trial ordered, with costs in that court to abide event.