METROPOLITAN TRUST CO. OF CITY OF NEW YORK v. CHICAGO & E. I. R. CO. et al.

(Circuit Court of Appeals, Seventh Circuit. October 1, 1918.)

No. 2530.

1. RAILROADS ☞167—MORTGAGES—AFTER-ACQUIRED PROPERTY.
   Ordinarily the lien of a railroad mortgage having the usual after-acquired provisions does not, on the consolidation of the mortgagor corporation with another, spread to the property contributed by the other constituent, or to after-acquired property of the consolidated company.

2. RAILROADS ☞171(2)—MORTGAGE—REGISTRATION—AFTER-ACQUIRED PROPERTY—CONSOLIDATION OF RAILROAD CORPORATIONS.
   A provision in a consolidation agreement that a mortgage on the property of one constituent railroad company, which contained after-acquired provisions, should have the force and effect of first mortgages executed by the consolidated company, held, in view of the failure of the mortgagee to record such mortgage in accordance with statute in counties where the consolidated company extended its lines, not to extend the security of the mortgage to the after-acquired property of the consolidated company, or the property contributed by the other constituent company to the consolidation.

3. RAILROADS ☞167—MORTGAGES—CONSOLIDATION—PROPERTY INCLUDED.
   A mortgage on the property of one railroad company, which was thereafter consolidated with another, held not to extend the lien to equipment acquired after the consolidation, etc.

4. RAILROADS ☞167 — MORTGAGE — AFTER-ACQUIRED PROPERTY — CONSTRUCTION OF MORTGAGE.
   A mortgage on the property of one constituent railroad company, which was thereafter consolidated with another, held not to apply by virtue of the replacement covenants to equipment purchased by the consolidated company to replace equipment originally owned by such constituent company.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. RAILROADS ☞167 — MORTGAGE — AFTER-ACQUIRED PROPERTY — REPLACEMENT COVENANTS.

A mortgagor's breach of a covenant for the maintenance and replacement of railroad equipment covered by the mortgage *held* to create no lien as to after-acquired equipment.

6. RAILROADS ☞167—MORTGAGE—PROPERTY COVERED.

Where a consolidated company, which succeeded the original mortgagor, disposed of equipment subject to the mortgage, and such sums went into the general coffers of the company and became mingled with its general funds, *held*, that the mortgagee could not establish a lien thereon after receivership.

7. RAILROADS ☞192—MORTGAGE—FORECLOSURE—SALE.

Where receivers were appointed for a consolidated railroad company, and mortgages foreclosed, *held*, that property, being susceptible of division into several systems, might be divided for sale, if for the benefit of creditors, and a mortgagee holding a mortgage on the property of that constituent company which had been run at a loss cannot complain of the severance.

8. RAILROADS ☞192—MORTGAGE—FORECLOSURE—SEVERANCE FOR SALE.

In the separation of a railroad into parcels for sale under the foreclosure of divisional mortgages, a court of equity is not bound by any hard and fast rule to fix the division to correspond absolutely with the several mortgage grants, but the division should be made so as to leave each parcel as nearly as may be in a situation to be operated as a railroad.

9. RAILROADS ☞192—MORTGAGE—FORECLOSURE—SEVERANCE FOR FORECLOSURE.

On foreclosure of constituent mortgages on the property of a consolidated railroad company, *held*, that the division should be made so that each portion might be operated as a railroad system, and for that purpose the division located in Indiana should be given a line to Chicago, etc.

10. RAILROADS ☞192—MORTGAGES—FORECLOSURE—SALE.

Where there were separate mortgages on the property of the constituent railroad companies, which were consolidated, *held* that, on division for sale it was proper, other creditors and lienholders being protected, to sell, with one of the constituent parcels, equipment used for the operation of that parcel, though it was not subject to the mortgage on the lien.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Bill by the Metropolitan Trust Company of the City of New York, as trustee, etc., against the Chicago & Eastern Illinois Railroad Company and others, which was consolidated with a creditors' bill, upon which receivers were appointed. From the decree, complainant appeals. Remanded, with instructions to modify.

Under a creditors' bill brought against the Chicago & Eastern Illinois Railroad Company, receivers were appointed who took and retain possession of its property. Bills were then brought in the same court for the foreclosure of mortgages as follows: Chicago & Indiana Coal Railway Company to the Metropolitan Trust Company et al., dated December 1, 1885; Chicago & Eastern Illinois Railroad Company to Central Trust Company, November 1, 1887; Chicago & Eastern Illinois Railroad Company to Bankers' Trust Company, July 1, 1905; Evansville & Terre Haute Railroad Company to Farmers' Loan & Trust Company, April 1, 1892. These suits were all consolidated with the first-named action.

The Chicago & Eastern Illinois Railroad Company is the result of successive consolidations, one of the constituents being a former corporation of

the same name, itself a consolidated corporation, which was the mortgagor of the Central Trust mortgage. Another constituent was the Chicago & Indiana Coal Railway Company, likewise a consolidated corporation, one of whose constituents by the same name was the mortgagor of the Metropolitan Trust mortgage. The Bankers' Trust mortgage was given by the company as consolidated in 1894. The Farmers' Loan & Trust mortgage was given by the Evansville & Terre Haute Railroad Company, which on July 20, 1911, consolidated with the Chicago & Eastern Illinois under the latter name. June 6, 1894, occurred the consolidation between the former Chicago & Eastern Illinois Railroad Company, an Illinois corporation, having substantially all its property in Illinois, and the said consolidated Chicago & Indiana Coal Railway Company, an Indiana corporation, having all its property in Indiana.

The record sets forth at great length the various steps in the organization, consolidation, etc., eventuating in the present company, and of the giving of the several mortgages by the company or by its constituent corporations. These are sufficiently stated in the statement of facts which precedes the opinion of Judge Carpenter of the District Court, as reported in Railway Steel Springs Co. v. Chicago & E. I. R. Co., 246 Fed. 338, to which statement we refer in order to avoid repetition.

The appeals are by the Metropolitan Trust Company alone, and are from three decrees, or rather there are three appeals from decrees concerning the same subject-matter; all the appeals having been heard as one.

The first decree of May 22, 1917, found, inter alia, that under the Metropolitan mortgage there were issued and outstanding bonds of the Indiana Coal Railway Company to the amount of $4,626,000, which with accrued interest, constituted a lien on the property of the Coal Railway Company in the mortgage described and by it owned at the time of the consolidation of 1894; that under the Central Trust mortgage there were issued and outstanding bonds to the amount of $21,343,000, which, with accrued interest, were a lien on practically all the property of the company excepting the said Coal Railway property and the Evansville & Terre Haute property; that the Bankers' Trust mortgage, to the amount of the bonds issued thereunder, viz. $18,019,-000, with accrued interest, was a lien on the property of the Chicago & Eastern Illinois Company, except the Coal Railway property and the Evansville & Terre Haute property; and that the Farmers' Loan & Trust mortgage, to the extent of the bonds issued thereunder, viz. $3,175,000, was, with accrued interest, a lien on the property formerly owned by the Evansville & Terre Haute Railroad Company. As to the findings respecting the Farmers' Loan & Trust mortgage, no question is raised. It ordered that the property of the company be sold, being first offered in certain parcels as fixed in the decree, and that there be reserved for further adjudication (1) questions of the extent of the liens of the several mortgages as between themselves, and the allocation between the mortgage estates of the expenses of the receivership and the payment of outstanding receiver's certificates; (2) for the benefit of the Metropolitan mortgage bondholders, all questions as to legality and effect of the consolidation agreement of 1894 as affecting the distribution of the proceeds of sale under the decree, and all questions as to the right of the Metropolitan bondholders to share in the proceeds of sale of various parcels decreed to be sold.

The second decree, bearing same date, merely fixed a time for the sale to take place.

The third decree, entered July 2, 1917, so far as it concerns the Metropolitan bondholders, disposed of the questions reserved by the first decree for further adjudication, and found that the Metropolitan mortgage was not a lien on any other property of the Consolidated Company than that owned by the Coal Railway at the time of the consolidation of 1894, and denied the petition of the Metropolitan Trust Company, which asked the court to set apart certain of the equipment for the benefit of its bondholders, and to decree that the lien of the Metropolitan mortgage be extended to such equipment, and found that no party to the actions was in position to dispute the validity of the consolidation of 1894, and that the Metropolitan bonds were a valid debt of the company.

Charles Evans Hughes, of New York City, and Frank H. Scott, of Chicago, Ill., for appellant.

Arthur H. Van Brunt, of New York City, for Central Trust Co.

Roberts Walker, of Scarsdale, N. Y., and Samuel Adams and Mitchell D. Follansbee, both of Chicago, Ill., for Bankers' Trust Co.

John S. Miller, of Chicago, Ill., for appellees.

Before ALSCHULER and EVANS, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). The questions presented and considered in the exhaustive briefs and arguments are mainly and in substance: (1) Was the lien of the Metropolitan mortgage extended by virtue of the consolidation agreement of 1894 to any property of the Consolidated Company thereafter acquired? (2) Does the lien of the Metropolitan mortgage attach to any equipment acquired after the consolidation of 1894, apart from the effect to be given specific provisions of the consolidation agreement? (3) In the enumeration of the property to be included in the various parcels to be separately offered for sale, should certain parts have been included with the Coal Railway property which by the decree of sale are not therewith included?

[1] Preceding the consideration of the first and main question we may state as a legal principle, applicable to railroad mortgages having the usual after-acquired provisions, the following from the first brief filed for appellant, that—

"Ordinarily on the consolidation of two corporations the lien of the mortgage of the constituent does not spread to the property contributed by the other constituent, or to the after-acquired property of the consolidated company"—citing in support New York Security Co. v. Louisville, etc., R. Co. (C. C.) 102 Fed. 382; Hinchman v. Point Defiance R. R. Co., 14 Wash. 349, 44 Pac. 867; Gilbert v. Washington City R. R., 33 Grat. (Va.) 586; Compton v. Jesup, 68 Fed. 263, 15 C. C. A. 397.

[2] To maintain that the Metropolitan mortgage lien was extended to all the property thus passing to and afterwards acquired by the Consolidated Company, there must therefore appear conditions effective to that end, aside from the mere fact of the consolidation itself. Appellant's counsel assume to find ample authority for the contention in 14 words of article VII of the consolidation agreement of 1894, which words are, referring to the Metropolitan and the Central Trust mortgages: "Shall have the force and effect of first mortgages executed by this consolidated company." It is contended that these words constituted the Metropolitan mortgage for all intents and purposes the mortgage of the Consolidated Company, and under the after-acquired property provisions of that mortgage subjected to its lien all the property of the Consolidated Company then or at any time thereafter owned or acquired.

The dominating influence of these words as bearing upon this question is thus stated in the brief for appellant:

"The determinative question (aside from questions relating to certain equipment and to the method of sale decreed) is nothing more or less than the proper construction and legal effect of 14 words in a written instrument, namely, the articles of consolidation whereby in 1894 the Chicago & Eastern

Illinois Railroad Company (itself a consolidated company of Illinois and Indiana) and the Chicago & Indiana Coal Railway Company (an Indiana corporation and also a consolidated company) consolidated to form the Chicago & Eastern Illinois Railroad Company, a corporation of Illinois and Indiana."

The context of these words is shown in the entire article VII, reproduced as a footnote [1] with the fourteen words italicized.

If these words must ultimately determine whether or not the lien of the Metropolitan mortgage was extended to property acquired by the company at and after the consolidation of 1894, we must in construing them, consider not only the words themselves, but their relation to other parts of the same instrument, and the situation of the parties and the property as well, and in case of any doubt, such construction, if any, as all concerned gave to them before any controversy arose.

It appears that long before the formal consolidation of 1894 the constituent Chicago & Eastern Illinois Railroad Company was an Illinois corporation, with its lines of railroad practically all in Illinois. It had theretofore acquired *all* the capital stock of the Coal Railway Company in exchange for its own stock, and it had in addition a 999-year lease of all of the Coal Railway property, and was operating that road as a part of its general system, although the separate corporate existence of the two was being formally maintained. After some years of such management it was deemed advisable that there be a consolidation of the corporation, already under the same ownership and direction, and this was undertaken. Thus managed, there was no occasion for careful weighing of the terms or expressions to be employed in effecting the consolidation. One legal repre-

---

[1] "Article VII.

"The mortgage or deed of trust made and entered into on the 1st day of November, in the year A. D. 1887, by and between the Chicago & Eastern Illinois Railroad Company and the Central Trust Company of New York, a corporation created by and existing under the laws of the state of New York, trustee, also the mortgage or deed of trust made and entered into on the 1st day of December, in the year A. D. 1885, by and between the Chicago & Indiana Coal Railway Company and the Metropolitan Trust Company of the City of New York, a corporation created and existing under the laws of the state of New York, and R. B. F. Pierce, of Crawfordsville, in the state of Indiana, trustees, *shall have the force and effect of first mortgages executed by this consolidated company,* and shall equally secure the payment of all bonds which have been issued under either of said mortgages or deeds of trust by the Chicago & Eastern Illinois Railroad Company, as well as all bonds which may be hereafter issued by this consolidated company, pursuant to and in accordance with the provisions of said mortgage or deed of trust made and entered into on the 1st day of November, in the year A. D. 1887, by and between the Chicago & Eastern Illinois Railroad Company and said Central Trust Company of New York, trustee.

"No bonds shall be hereafter issued under or pursuant to said mortgage or deed of trust made and entered into on the 1st day of December, in the year A. D. 1885, by and between the Chicago & Indiana Coal Railway Company and said Metropolitan Trust Company of the City of New York and said R. B. F. Pierce, trustees; but nothing in this article contained shall be construed in such manner as to limit or restrict the powers of this consolidated company to execute other mortgages or deeds of trust conveying its property, or any part thereof, to secure, the principal or interest of any other debt or debts which it may create."

sentative acted for both parties to the agreement, and there was not to be expected that degree of circumspection in the selection of words and phrases as would probably have been the case had there been contracting parties with interests in conflict. The mortgagees of the divisional mortgages were in no manner represented, and the several liens under their mortgages on property existent were not and could not have been affected by that transaction. The claim is that the fourteen words of the agreement made the Metropolitan and the Central Trust divisional mortgages both first mortgages of the Consolidated Company, with the practical effect, so far as concerns the present action, of extending each of the mortgages to all of the property of the company covered by the other, and under the after-acquired provisions of the mortgages, giving each a lien on all property thereafter acquired by the newly consolidated company.

If this is the purpose of the 14 words, they could not in fact have effected this end. Concededly neither these nor any other words which the two mortgagors might in the agreement for consolidation have employed could have given the Metropolitan bondholders a first mortgage on the already mortgaged property of the constituent Chicago & Eastern Illinois Company, nor could the Central Trust bondholders have thus secured a first mortgage on the already mortgaged property of the constituent Coal Railway Company. The stockholders might consolidate the corporations, but they could not consolidate the separate mortgages given on the distinct properties of the separate corporations. By their very terms the 14 words, if purporting to make of each of these mortgages a new first mortgage of the Consolidated Company, would give to each of the mortgagees a first mortgage on all its then existing property, and on all it might thereafter acquire—a result clearly impossible, and which it is not at all likely it was any more intended than it could have been effected.

Nor can it with reason be contended that by these words it was intended that each mortgagee, retaining its lien upon the property mortgaged, was granted a second mortgage on the other's property, subject to the prior lien of the other mortgage. The 14 words do not purport to have such effect, nor is such construction warranted by any other part of the article or the instrument.

It is insisted that the immediately following words of the article further appellant's contention. They are:

"And shall equally secure the payment of all bonds which have been issued under either of said mortgages or deeds of trust by the Chicago & Eastern Illinois Railroad Company or the Chicago & Indiana Coal Railway Company, as well as all bonds which may be hereafter issued by this consolidated company, pursuant to and in accordance with the provisions of said mortgage or deed of trust made and entered into on the 1st day of November, in the year A. D. 1887, by and between the Chicago & Eastern Illinois Railroad Company and said Central Trust Company of New York, trustee."

These words also, taken at their face, show a further want of exactness of expression on the part of the draftsman of the instrument. They purport to secure equally the holders of the bonds of both mortgages. If intending to equally secure the payment of all bonds which have already been issued under both of said mortgages, as well as those

which may thereafter be issued under one of them, it again undertook what could not be performed. The literal carrying out of this condition would require wiping out all distinction between the two mortgages, and letting in the bondholders of both on the same footing as to the properties which severally secured the two mortgages, and letting in on the same basis and with like parity of security the holders of bonds to be subsequently issued under one of the mortgages. Although the words themselves might bear this construction, this could not have been done and was evidently not intended. No act of these mortgagors, whether dealing at arm's length or in perfect unison, could have had the effect of combining the securities under the two mortgages, or of subjecting the security of one to equality of lien with bonds which might subsequently be issued under the other mortgage.

Article VII was evidently not first conceived to meet this particular situation. It follows article VII of an earlier consolidation agreement of the former Chicago & Eastern Illinois Railroad with other corporations, and therein are found these significantly similar words:

"The mortgage or deed of trust made and entered into on the 1st day of November, in the year 1887, by and between the Chicago & Eastern Illinois Railroad Company, party of the first part hereto, and the Central Trust Company of New York, a corporation created by and existing under the laws of the state of New York, trustee, shall have the force and effect of a first mortgage executed by the consolidated company, and shall equally secure the payment of all bonds which have been issued under it by the Chicago & Eastern Illinois Railroad Company, as well as pursuant to, and in accordance with its provisions by the Consolidated Company."

The object of the employment of this language in the earlier instrument of consolidation is to be gathered from a peculiar clause in the Central Trust mortgage which is as follows:

"If the railroad company shall hereafter consolidate its property and franchises, by sale or otherwise, with the property and franchises of any other railroad company or companies, the several parties to such consolidation may, by apt words expressed in the agreement, give to this indenture the force and effect of a mortgage conveying to the trustee, above named, or its successor, all of the railroads and appurtenant property of the several parties, at the date of such agreement, and all railroads and appurtenant property which may be thereafter acquired, by construction or otherwise, by such consolidated company, to secure upon terms of equality the bonds which may have then been issued hereunder by the railroad company, as well as all bonds which may be thereafter issued by such consolidated company, in substantial compliance with the provisions hereof. In case such agreement shall be made, bonds issued by such consolidated company, shall be substantially in the forms above set forth, but in the name of the consolidated company, and shall be executed under its corporate seal and attested by the signatures of its president and secretary. It is the intent of this provision to invest such consolidated company with power to issue bonds for the purposes expressed, and subject to the conditions named in this mortgage or deed of trust, to the same extent as they could be issued by the railroad company if no such consolidation had been made, thereby giving to the holders of all bonds issued hereunder, whether by the railroad company or its successors, equality and security."

Under this clause of that mortgage the bondholders agreed that, if future consolidating companies shall provide in their articles of

consolidation that the mortgage shall be the mortgage of the consol-idating company, bonds may continue to be issued thereunder, and that all holders of bonds thereunder, whether issued before or after the consolidation, shall have equal security with each other on all the property upon which at any time the mortgage becomes the lien.

The agreement between the then consolidating companies thus became a necessary step to render effective this provision of the mortgage by which the bondholders thereunder were bound respecting equal security of then existing bonds and such as were issued under the same mortgage after the consolidation. That mortgage was the same Central Trust mortgage now under consideration, and when in 1894 the consolidation in question occurred, in order to render effective in this consolidation the same provision in the same mortgage, so it would remain an open mortgage under which the Consolidated Company might raise funds for further extensions, etc., it was properly deemed essential that the agreement of consolidation of 1894 should, as in the prior consolidation, make provision that the Central Trust mortgage be kept open to admit of future bond issues thereunder, with equality of security between all bonds theretofore, and all those subsequently issued thereunder. The agreement to that effect between the consolidators was just as essential in 1894 as it was in 1887, the year of the former consolidation. And so it is not strange that in 1894 practically the same language was employed to this end as was by the same persons employed a few years before, in respect to the same mortgage, to effect the same general purpose.

It being deemed necessary, or at least proper, in 1894 to deal specifically with the Metropolitan Trust mortgage in order that no further bonds should be issued thereunder, the language of the earlier provision was somewhat changed. But we do not regard the general intent and purport to have been different in the one transaction than in the other respecting the mortgage which was to remain the active open mortgage of the Consolidated Company.

The two mortgages were unlimited in the bonds issuable thereunder. But the Metropolitan mortgage contained no such broad authorization as the Central Trust mortgage, whereunder the mortgage might continue effective for the issuance of further bonds by a consolidated corporation if the consolidators should by "apt words" so declare in their articles of consolidation. It was evidently conceived that with the broad authorization and power of that clause, the Central Trust mortgage was better adapted for future bond issues to provide for growth and extension after the consolidation, than was the Metropolitan mortgage. It is evident to us that the consolidators of 1894 appreciated the situation, and that article VII of the consolidation agreement was designed to meet it. It provided not only "apt words" for giving effect to the quoted clause of the Central Trust mortgage, but it definitely specified that the Metropolitan mortgage should thenceforth be closed, and that no further bonds be issued thereunder, and that the Central Trust mortgage should remain open so that further bonds thereunder might be issued to pay for further exten-

sions and improvements in accordance with the terms of the mortgage, with equal security to both new and old bondholders thereunder.

Conceding that in the absence of provisions to the contrary the consolidation would of itself have closed the Metropolitan mortgage and prevented the extension of its lien to further acquired property of the Consolidated Company, appellant's counsel insist that the provision in article VII with reference to the Metropolitan Company manifested an intention to make provision respecting the Metropolitan mortgage different from what would have been the case if it had not been mentioned at all. We do not think that such intention to make some different provision necessarily appears. Draftsmen of instruments frequently express definitely that which, if omitted, would, through operation of the law have produced the same result, so that the expression is in a sense a redundancy. This is often out of an abundance of caution, and to avoid, so far as possible, leaving the desired conclusion to construction or inference. It is quite probable that the draftsman was not content to leave the matter of the closing of the Metropolitan mortgage to the inferences to be drawn from such cases as New York Security Co. v. Louisville, etc., R. Co., and the others cited supra, but chose rather to express definitely the purpose and intent to close the Metropolitan mortgage and issue no further bonds thereunder in contradistinction to the intended course as to the Central Trust mortgage, viz. to continue it as the mortgage of the Consolidated Company, for the purpose of raising thereunder further funds for the large extensions which evidently were in contemplation.

Another instance in the same consolidation agreement of the distinct expression of that which in any event the law would impose is found in article X, whereby the Consolidated Company assumes all the debts and obligations of the constituent companies. The definite expression of this obligation does not suggest that one should seek in it a significance or meaning beyond or different from the general obligation of a consolidated corporation to discharge the debts of its constituents.

The inclusion of the Metropolitan in article VII had no essential significance beyond the definite recognition by the Consolidated Company of the mortgage as a lien upon part of the property so about to pass to the Consolidated Company, and of the purpose to close the mortgage to the further issue of bonds thereunder. Under the law as it is stated in the above quotation from brief for appellant, the situation of the Metropolitan mortgage is not materially different from what it would have been had all reference to it been omitted from article VII. In such case it would plainly not have been contended that any lien thereunder was extended to any future acquisitions or extensions of the Consolidated Company.

That no further or different obligations or rights as now contended for were created or imposed by article VII was evidently long the view of all of those who had any duty or function concerning these matters. For 20 years following this consolidation important extensions were being made to the lines of the company, and large sums of

money raised to pay for them and for equipment through further bond issues under the Central Trust mortgage and the subsequent Bankers' Trust mortgage—$13,950,000 Central Trust, and $18,019,-000 Bankers' Trust, bonds. No further money was raised under the Metropolitan mortgage. The extensions were made largely in the state of Illinois, running into many counties thereof not theretofore entered by this system. While the fact of making these extensions, was of necessity open and notorious, nowhere in Illinois was the Metropolitan mortgage ever recorded, notwithstanding the statutory provision in Illinois that railroad mortgages shall be recorded in every county in the state through which they run. Section 4, Act May 7, 1873 (Acts 1873, p. 142). We are not considering this as bearing on any question of the validity of the Metropolitan mortgage as a lien in Illinois, but as significant of the intent and purpose and understanding of the parties; for it is not likely that this mortgage, if considered by the mortgagor a lien on the railway extensions in Illinois, would long have remained unrecorded in that state.

The fact that during all these years the Consolidated Company paid the interest on the Metropolitan bonds does not materially minimize or change the inference of fact to be drawn from the omission to record the mortgage in the many counties in Illinois into which the lines were extended with the funds raised under the Central Trust and Bankers' Trust mortgages.

On the part of the consolidators no reason or motive is apparent wherefore they would undertake by the consolidation agreement to extend the lien of the Metropolitan mortgage to property other than that which it covered at the time of the consolidation. The mortgage was to be closed so that no further bonds would be marketed thereunder. The bonds already issued were disposed of, and there appears no reason why the consolidators should have wished to make the Metropolitan bonds more attractive as an investment. But having determined to employ the Central Trust mortgage to raise money for the contemplated extensions, there was every reason why bonds thereunder, to be placed upon the market for raising large sums, should be made as attractive as possible in order to invite investment in them. But the inevitable result of making the Metropolitan bonds a lien upon extensions would have been an impairment of the company's further borrowing power under the Central Trust mortgage, as well as under the subsequently issued Bankers' Trust mortgage. It is to be noted that under these mortgages bonds for extensions could be issued for the amount of $18,000 per mile of main track including any prior liens thereon, and that in the many certificates issued for the certification of bonds for extensions, the Metropolitan mortgage was never mentioned as an existing lien.

It would in our judgment require more than the construction undertaken to be given these 14 words to warrant the conclusion that the consolidators thereby intended to or did undertake to bind the Consolidated Company, as well as the Central Trust mortgage, to an extension of the lien of the Metropolitan mortgage to the Central Trust security then on hand, and to the lines of the Consolidated Com-

pany thereafter acquired, and we conclude on this question that the district court did not err in holding the lien of the Metropolitan mortgage on the railway to the lines of the Coal Railway Company at time of the consolidation of 1894.

[3] As to claim of lien on equipment, in so far as the claim is for a lien on all existing equipment acquired after the consolidation of 1894, arising through the said 14 words of article VII of the consolidation agreement, and the after-acquired property provisions of the Metropolitan mortgage, what has already been said respecting the operation of these provisions as bearing on the railroad lines constructed or acquired after the consolidation, applies likewise to equipment, and with like effect; necessitating the finding against appellant upon such contention.

[4, 5] Of the original 3,065 units of Coal Railway equipment subject to the lien of the Metropolitan mortgage, which passed to the Consolidated Company in 1894, all have disappeared save 114 thereof, which the receiver disposed of and the proceeds were decreed to be applied on appellant's mortgage debt. It is contended for appellant that "even though appellant's position on the principal controversy should be incorrect, appellant is entitled to a lien upon equipment of an equal value or amount with the equipment which was subject to its mortgage at the time of the consolidation"; that the Consolidated Company had the use of this equipment and derived revenue from it and wore it out, and replaced such thereof as became useless with other equipment; that the Consolidated Company always possessed and that the receiver took and held equipment, in replacement of that which the Coal Railway contributed to the consolidation of 1894, and that to the value of such Coal Railway equipment as went into the consolidation the Metropolitan is entitled to a lien upon equipment. We find no evidence of the value of the Coal Railway equipment at the time of the consolidation, beyond the fact that its cost price was $1,230,357.71, and that as against this $1,215,000 of the Metropolitan bonds were issued.

It does not appear that through bookkeeping, accounting, marking or in any manner whatever the Consolidated Company ever set apart any of the much larger equipment it acquired after the consolidation, as in replacement of disposed-of Coal Railway equipment, or that any steps whatever were taken to subject to the lien of the closed Metropolitan mortgage any of the subsequently acquired equipment, as in replacement of that disposed of. The most frequent practice of the Consolidated Company was to procure equipment from the makers, who took trust certificates or other obligations, under which they retained the title, or a lien on the equipment, for the price of it, and from time to time the Central Trust Company or the Bankers' Trust Company would certify bonds in accordance with the provisions of their mortgages not exceeding the value of the equipment, to supply funds with which the company might discharge its obligations therefor to the makers, and thus acquire title from or release of the liens of the makers. To a certain extent also the Consolidated Company bought equipment, and from time to time the Central and Bankers'

Trust Companies issued bonds as against the equipment for the amount of its value. Since the consolidation of 1894 bonds under these mortgages have been certified and issued as against practically all of the equipment acquired after the consolidation, aggregating $15,343,000—an amount which is evidently far in excess of the present value of the 23,000 units of equipment in the hands of the receiver to be sold under the decreed liens of the Central Trust and the Bankers' Trust mortgages.

This contention for a lien of the Metropolitan rests, not on any covenant for lien on after-acquired property, but on a contractual obligation of the mortgagor to maintain and replace the mortgaged equipment. But the Metropolitan mortgage imposes no such obligation. The usual covenant for maintenance and replacement of equipment is not to be found in this mortgage. The nearest approach is a provision in article VIII empowering the trustees to allow the railway company to dispose in its discretion of such equipment, machinery and the like, as may have become unfit for use, the company replacing such by new, and all property acquired to replace "any of the property conveyed under the provisions of this article" to be subject to the lien of the mortgage without other act or conveyance. The evidence does not show any equipment to have been disposed of under the terms of this article. Evidently it was considered that the after-acquired property provisions of the mortgage would sufficiently protect the mortgagee in this regard. But these provisions having under the circumstances become ineffectual to that end, we are not at liberty, in the absence of evidence of fraudulent, mistaken or accidental omission, to import into the mortgage a replacement covenant which the parties have not included. But if it were there, or if the provisions present were properly to be construed as such a covenant, no lien would attach merely because of the mortgagor's breach of the covenant through its failure to maintain and replace the Coal Company equipment of 1894. United States Trust Co. v. Wabash W. Ry. Co. (C. C.) 38 Fed. 891; Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339.

[6] There is considerable discussion in the briefs respecting the proceeds of equipment subject to appellant's mortgage which from time to time the Consolidated Company disposed of, the amount of which was found to be $196,846.61. Part of this amount is based on the stipulation that the scrap value realized by the company for cars dismantled, destroyed or becoming otherwise useless was $95 per car. The master found the number of such cars to be 1,159, but from our examination of the evidence it appears to be 2,055, thus increasing the total so received to $281,966.61. Counsel for appellant maintain that the money so realized could not honestly have been retained by the company, except upon the theory that appellant's lien would attach to equipment which supplied the place of that disposed of, and that since the presumption is in favor of the honesty of the railway company's officers, it should be concluded that the Consolidated Company intended and understood that the Metropolitan lien would attach to units of subsequently acquired equipment equal to the dis-

posed-of Coal Railway units. Assuming even this to be so, the understanding of the Metropolitan officers could not bind the mortgagees who through their subsequent advancements as against this equipment acquired the superior equity. The amount so received by the Railway Company on account of its disposal of the mortgaged equipment was not in any manner segregated or paid into a trust fund, but went into the general coffers of the company and became indistinguishably mingled with its funds. It is not and could not well be seriously contended that these funds were traceable into the hands of the receiver, so that appellant might maintain a lien thereon, or priority of claim therefor.

[7] Lastly, it. is complained that the decree improperly ·severs the Coal Railway from the balance of the Chicago & Eastern Illinois system, special criticism being made of the noninclusion with the Coal Railway in the foreclosure sale as decreed, of the line from Otter Creek to Brazil, Ind., and the line from Momence, Ill., to the Indiana-Illinois state line, and also of any of the equipment.

Respecting generally the severance and sale of the Coal Railway from the rest of the so-called Chicago & Eastern Illinois system, we are satisfied the decree of the district court was proper. The Metropolitan mortgage covers the Coal Railway only. The Coal Railway does not appear to be essential to the rest of the system, nor the rest of the system to the Coal Railway. It does not appear to us that either materially supplements the other. The master's report finds the Coal Railway to be a parallel and competing line with the Chicago & Eastern Illinois, and indeed the Coal Railway appears to be in a small way a system in itself. The association and ultimate consolidation of the two was manifestly for the purpose of eliminating competition between them. There appears no such interrelation between these parts as to suggest substantial disadvantage to either from the severance decreed, except as is hereinafter indicated and provided against.

Under the evidence the master found that the Coal Railway division was being and for some time had operated at considerable loss. Ordinarily this of itself would not be a sufficient cause for "sloughing off" branches, or disrupting a railroad system. While deliberate purpose to run down and make unprofitable the Coal Railway division of this system is suggested, no evidence appears to connect the trustees or bondholders of the Central Trust mortgage with any such purpose. That mortgage was given before the consolidation, and if it be true that the Coal Railway can be operated only at a loss, it would diminish the security of the Central Trust mortgage if the more remunerative property upon which it is secured, could be sold on foreclosure only in connection with the losing Coal Railway. In any view of this record, we see no impropriety in the decree in permitting severance and separate sale of the Coal Railway under the foreclosure of these mortgages. ·

[8] But in the separation of a railroad into parcels for the sale under the foreclosure of divisional mortgages a court of equity is not bound by any hard and fast rule to fix the parcels or divisions to·

correspond absolutely with the several mortgage grants. The rights of all parties should of course be protected, without overlooking the interest of the public in the continued beneficial operation of public highways constructed and operating under its authority. The severance from one division of a part necessary to its successful operation, and not essential to the operation of any other part, cannot be justified on the ground alone of mortgage descriptions. If division must be made it should be, so far as is reasonably possible, at points which will leave the various divisions as nearly as may be in situations to be operated as railroads.

[9] The complaint which appellant makes because of the noninclusion with the Coal Railway division—or parcel D as fixed in the decree—of the road from Otter Creek to Brazil, Ind., does not impress us as well founded. This is an east and west line connecting the southern terminus of the Coal Railway with the Chicago & Eastern Illinois. By it the latter reaches the Brazil coal fields, enabling it to compete for that traffic with the Coal Railway which otherwise reaches that field, to eliminate which competition these lines became associated under one ownership and were ultimately consolidated. For traffic south of its line the Coal Railway has other connections. The Brazil-Otter Creek line would for the Coal Railway be merely a connecting link between itself and the Chicago & Eastern Illinois, while to the latter it means an entry into these coal fields. The advantage to the Coal Railway in having it, or its disadvantage in not having it is far outweighed by its greater advantage to the Chicago & Eastern Illinois and ensuing embarrassment of the latter if severed from it. Equitable considerations dictate its inclusion with the Chicago & Eastern Illinois rather than with the Coal Railway parcel.

With the Momence-State Line road the situation is quite different. This was built before the consolidation, by the Chicago & Eastern Illinois, but after a community of interest had been established between the two lines, to join a line built about the same time by the Coal Railway from Percy Junction, Ind., to the state line. The two form a line about 40 miles long (about 29 miles in Indiana and about 11 miles in Illinois) running in a northwesterly direction towards Chicago and constituting the most advantageous and logical connection of the Coal Railway for its traffic with Chicago, which is the principal market for the coal and other commodities carried by the Coal Railway. It serves to form a continuous line from Momence through Percy Junction and thence in the same general southerly direction about 100 miles further to the south terminus of the Coal Railway. That this Momence-State Line bit of road was by the Consolidated Company regarded as really a part of the general Coal Railway property is indicated in a description of it in the Bankers' Trust mortgage, where in connection with the Coal Railway from the state line to its southern terminus it was described as "a main line of railroad extending from Momence, Ill., by way of Goodland, Ind., to Brazil, Ind." There are no stations of any importance between Momence and Percy Junction, and it seems plain that severance arbitrarily at the state line would leave the Illinois stub end of practically

little value to the Chicago & Eastern Illinois and considerable of an embarrassment and loss to the Coal Railway through interference with a continuous line to its normal connection at Momence. We think that upon due protection to the lienors of the Momence end of this line, it should be included in and disposed of with the Coal Railway property.

[10] As to inclusion with the Coal Railway in the foreclosure sale of part of the equipment, what has been said respecting the Momence-State Line piece of railroad is even more applicable upon this proposition. A railroad without equipment can serve no function. While it may be said that new equipment can be acquired for the Coal Railway, this would evidently involve outlay much greater than would the retention for this road of a reasonable amount of the equipment such as has been and is in constant use thereon, and is adapted to its needs. The equipment found to be subject to the lien of the Central Trust mortgage as described in section II of article XXXVII of the decree of sale, and ordered sold with the Chicago & Eastern Illinois parcel, comprises some 23,300 units, and has been and is in use over and for the entire system, including the Coal Railway. Doubtless some of it has long been used exclusively in the operation of the Coal Railway. If all is to be withdrawn from the Coal Railway division, the Coal Railway will have none at all, while the Chicago & Eastern Illinois will have for its use all that theretofore served both itself and the Coal Railway. The Central Trust and Bankers' Trust bondholders cannot as such have any interest in depriving the Coal Railway of all equipment, so long as it realizes to them its fair value, and does not through the manner of its disposition impair the value of the other property upon which their obligations are secured. As the Coal Railway has been and is now equipped with a portion of this equipment it cannot be said that the remaining part of the system will be in any manner injured if a due portion of the equipment is sold with the Coal Railway.

As to the railroad from Momence to the state line, and equipment for the Coal Railway, the decree of sale should be modified so as to provide that the railway, from its junction with the Chicago & Eastern Illinois main tracks at Momence to the Indiana state line, and all right of way, stations, depots, structures, telegraph and other appurtenance thereto, be, under the direction of the district court, fairly appraised, and that under same direction there be set apart from the equipment found in the decree to be subject to the Central Trust mortgage lien, an amount thereof reasonably necessary and suitable for the operation of the Coal Railway as a going operating road, having reference also to the operating needs of all the divisions now being served by all of such equipment; and that under the direction of the court the equipment so set apart for the Coal Railway be appraised at its fair market value; that thereupon within a time to be fixed in the decree, appellant indicate as the district court may direct, whether or not the Momence-State Line road, or the equipment set apart, or both are acceptable at such appraised values, and if acceptable, they or such as is acceptable, be accordingly included and offered for sale with said Coal Railway; and upon the sale thereof, before any part of

the proceeds of same is applied upon the Metropolitan Trust debt, the amount or amounts of such appraised valuations shall be retained by the master out of such proceeds, to stand in lieu of and in the substitution for said Momence-State Line road and the said equipment so set apart, the amount so retained to be subject to the liens as now fixed in the decree upon the railroad and equipment; and if the acceptance of appellant as above provided for is not forthcoming, the railroad or equipment as to which the acceptance is not made shall not be so included with the Coal Railway, but shall be disposed of in the manner provided in the decree; the expense of such setting apart and appraisements to be borne by appellant, unless before this is done appellant shall file its disclaimer of any claim for such inclusion of the Momence-State Line road, or equipment, or both. In the case of such inclusion with the Coal Railway of the Momence-State Line road, or equipment or both, the decree should be further correspondingly modified as to the upset prices therein fixed, and in other respects where necessary to conform.

The cause is remanded with instructions to so modify the decree of foreclosure as to make it conform hereto. In the other respects the decrees are affirmed. Two-thirds of the costs of the appeals shall be paid by appellant, and one-third by appellees.

On the argument Judge KOHLSAAT sat with the court, but he died before the opinion was prepared.