GUARANTY TRUST COMPANY OF NEW YORK, as Trustee under First Mortgage of STEINWAY RAILWAY COMPANY OF LONG ISLAND CITY, Dated April 1, 1892, Appellant, Respondent, *v.* NEW YORK AND QUEENS COUNTY RAILWAY COMPANY and Another, as Trustee under First Consolidated Mortgage of NEW YORK AND QUEENS COUNTY RAILWAY COMPANY, Dated June 29, 1896, Respondents, Appellants, Impleaded with EMPIRE TRUST COMPANY, as Trustee under First and Refunding Mortgage of NEW YORK AND QUEENS COUNTY RAILWAY COMPANY, Dated November 1, 1906, and Another, Respondents, and STEINWAY RAILWAY COMPANY OF LONG ISLAND CITY and Others, Defendants.

Second Department, May 24, 1929.

*Alfred T. Davison* [*Charles E. Hotchkiss* and *H. C. McCollom* with him on the brief], for the plaintiff Guaranty Trust Company of New York, as trustee.

*Charles F. Kingsley* [*Arthur G. Peacock* and *James L. Quackenbush* with him on the brief], for the defendant New York and Queens County Railway Company.

*James H. McIntosh,* for the defendant Bankers Trust Company, as trustee.

SCUDDER, J.   This action is to foreclose a mortgage for $1,500,000 on all the property of the Steinway Railway Company of Long Island City, dated April 1, 1892, and made by the Steinway Railway Company to the State Trust Company as trustee.

The plaintiff is the successor trustee.

By the judgment herein the mortgage was foreclosed for principal and interest, and the extent of its lien upon the property of defendant New York and Queens County Railway Company was adjudicated.

The New York and Queens County Railway Company is the present owner of the mortgaged property of the Steinway Railway Company, through its merger of that company.

The defendant Bankers Trust Company is the trustee under a mortgage made in 1896 by the New York and Queens County Railway Company.

The controversy before this court is in regard to certain properties which the plaintiff contends come within the lien of the foreclosed Steinway mortgage, and which the defendants contend do not.

At the time of the date of the foreclosed mortgage, April 1, 1892, the Steinway Company, incorporated in 1892 under the Railroad Law, was an independent corporation operating a street railway in Long Island City.   In the spring and summer of 1895 other street railways were operating under common management with the Steinway Company in Long Island City, Newtown, Flushing and College Point.   They were:

1. Newtown Railway Company, incorporated September 19, 1894, and operated by the Steinway Company under a lease.

2. Long Island City and Newtown Railroad Company, operated by George Chambers, as receiver.   He was the superintendent and general manager of the Steinway lines.

3. Flushing and College Point Electric Railway Company, operated by the Steinway Company under a lease.

4. Riker Avenue and Sandford's Point Railway Company, operated by the Steinway Company under a lease.

In 1895 and 1896 R. T. McCabe was president of the Steinway Company, and he and his associates were in operating control of all the lines above mentioned, and in financial control of all except those of the Long Island City and Newtown Company, of which, however, the company being in default and foreclosure proceedings under way, they had acquired the bonds.

Benjamin Orne, representing McCabe, in the summer of 1896 interested Drexel & Company and others, all of Philadelphia, in a proposed consolidation of the above lines to be operated by a company thereafter to be formed. They and Benjamin Orne entered into an agreement, dated November 1, 1895, by which a syndicate was created for financing the project. Orne, by an agreement of the same date with Drexel & Company, undertook to deliver all the capital stock of the Steinway Company, the Newtown Railway Company, the Riker Avenue and Sandford's Point Company, the Flushing and College Point Company, and all of the mortgage bonds of the Long Island City and Newtown Company to the syndicate. Orne's agreement contemplated the delivery of the securities on or before December 4, 1895.

The syndicate proposed to consolidate the said railways owned or controlled by McCabe and his associates into a new corporation, which was to issue bonds in the sum of $2,500,000 and stock of the par value of $2,500,000.

Drexel & Company, acting as managers, agreed to advance $2,000,000 from time to time to take up the floating debts of the corporations, to pay for the securities and to provide " such additional amounts as may be needed in the operation " of the corporations prior to the proposed consolidation and preparatory thereto.

There was delay in completing the plan of the Philadelphia syndicate for the consolidation of the five companies. Foreclosure of the mortgage upon and sale of the Long Island City and Newtown lines interfered with the time schedule, and it was not until August 19, 1896, that these lines were bought in by W. R. Heath, a brother-in-law of McCabe and his representative in the transaction. During the interval McCabe continued to operate the several properties.

In the meantime the New York and Queens County Railway Company had been incorporated under the railroad laws of New York, the certificate being filed June 26, 1896. The certificate recited the intention of the incorporators to acquire the property and franchises of the Long Island City and Newtown Railroad

Company recently sold under foreclosure to W. R. Heath, and all of the capital stock of the other four corporations above named, so that said railroads and all their rights, property and franchises should be merged with the new corporation.

The New York and Queens Company executed and delivered its first consolidated mortgage to the Mercantile Trust Company, predecessor of the Bankers Trust Company, June 29, 1896, which was recorded August 4, 1896. By supplemental indenture this mortgage was reduced from $4,200,000 to $1,300,000. The consolidated mortgage recites that so far as the Steinway property is concerned it is second to the Steinway mortgage.

The period between the organization of the syndicate on November 1, 1895, and the organization of the New York and Queens Company on June 26, 1896, was considerably longer than the members of the syndicate originally contemplated. The agreement between Orne and Drexel & Company provided for delivery of the securities preparatory to consolidation on December 4, 1895, five weeks after the date of that agreement. During these five weeks, and thereafter throughout the whole period of delay, the various properties were operated and directed by McCabe. The results of the operation of the several properties by McCabe, pending formation of the New York and Queens Company, were recorded as a matter of convenience on the books of the Steinway Company. This corporation was used generally as the bookkeeping and contracting agent for everything done by the syndicate up to the time of the formation of the New York and Queens Company.

The Steinway Company was merged into the New York and Queens Company by certificate of merger filed in the office of the Secretary of State September 16, 1896.

The Steinway mortgage recites that the Steinway Company has authorized its bonds to be secured by a mortgage, " the same to be a first lien upon all the franchises and property of the said Railway Company, real, personal or mixed, now owned or that may hereafter be owned and acquired."

The granting clause conveys " all the corporate property, real, personal and mixed, and all franchises, rights, privileges and incomes of the party of the first part, and also all and singular its railroads now constructed or which may hereafter be constructed in Long Island City."

It is followed by the description of the routes, and of the Steinway car barn property. The general inclusive clause reads as follows:

"And also all and singular the lands, tenements, and hereditaments which are now acquired or appropriated by or on behalf of the said party of the first part for the purposes of the road, whether

for said railroad or any part thereof, or which now belong to or have been conveyed or transferred to, or owned, held, used or possessed by or for the said party of the first part, or which may hereafter belong to or be conveyed or transferred to or owned, held, used, or possessed by or for the said party of the first part; and also all and singular the railways, ways and rights of way, road beds, sleepers, rails, main tracks, side tracks, branches, turnouts, and all extensions of such tracks, main tracks, branches or turnouts which may hereafter be made; and all other structures, stables, and car houses, machine shops, work shops, factories, horses and cars and all other rolling stock and equipments, machinery or materials for the constructing, operating, equipping, repairing or refitting said railroad, or any part thereof, or convenient or necessary for use in connection therewith, which now belong to or are conveyed or transferred to, or are owned, held, used, or possessed by or for the said party of the first part, or which may hereafter belong to or be conveyed or transferred to or be owned, held, used or possessed by or for the said party of the first part; and also all and singular the liberties, privileges, and franchises connected with or relating to said railway, or the construction, maintenance or use thereof, including the franchises to be a corporation which are now or may hereafter be possessed or exercised by the party of the first part; and also all and singular the rights, liberties, franchises, lands, tenements, hereditaments, property, real, personal or mixed, now belonging to or conveyed or transferred to or owned, acquired, held, used or possessed by or for the said party of the first part, and every part thereof, together with all and singular the endowments, income and advantages, tenements, hereditaments, easements, and appurtenances to the above-mentioned lands, railway property, franchises, or premises, or any part thereof, belonging to or in any wise appertaining and the reversion and reversions, remainder and remainders, rents, issues and profits thereof; and also all the estate, right, title, interest, property, possession, claim and demand whatsoever as well in law as in equity of the said party of the first part, of, in and to the same and every part thereof with the appurtenances.''

The Steinway Company covenanted as follows:

Article 2, to execute and deliver all further acts, deeds and assurances for better assuring unto the trustee and its successors '' all and singular the lands, and other property, equipment, appurtenances, rights and franchises hereby conveyed or intended so to be, whether now owned or possessed, together with all such property and franchises as may be hereafter acquired by the said party of the first part, as by the said trustee or its successors shall be required.''

Article 8, " for itself and its successors " to keep the property insured and to assign the policy of insurance to the trustee.

Article 14, for itself and its successors, to acquire, possess and hold property thereafter acquired " upon and subject to the trusts " created by the mortgage, until conveyance thereof to the trustee.

Article 16, for itself and its successors, to " perform and keep all and every the covenants " by it to be performed, and if it defaults, that a decree for specific performance may be obtained.

The granting clause in the mortgage contains no language specifically referring to property " hereafter acquired " by a successor corporation. The phrases used in reference to after-acquired property to be covered by the mortgage generally describe it as " conveyed or transferred to " or " owned, held, used or possessed by or for " the said party of the first part.

As I read the Steinway mortgage, I find nothing unusual in its phraseology which distinguishes it from other mortgages containing after-acquired property clauses which have been construed by the courts in the matter of the scope or inclusiveness of their after-acquired property provisions.

It seems, then, to be appropriate to attempt to state what under the authorities appears to be the rule governing priority of mortgage liens on property acquired after the original mortgagor has ceased to function in its corporate capacity and its activities are being exercised by a successor in title.

In a merger or consolidation of companies, the new or consolidated company (in this case the New York and Queens County Railway Company) becomes and is the possessor of each of its component members. (*Irvine* v. *New York Edison Co.*, 143 App. Div. 344; affd., 207 N. Y. 425; *Wright* v. *Wright*, 225 id. 329; *Syracuse Lighting Co.* v. *Maryland Casualty Co.*, 226 id. 25; *McElwain Co.* v. *Primavera*, 180 App. Div. 288.)

These cases may be said to define, as far as they go, the obligation of possessor corporations in the matter of debts of a merged corporation, and the extent that the corporate existence of such a merged corporation is preserved.

I gather from the authorities cited later that when such possessor corporation independently provides accessions, accretions or additions to the property to which it has succeeded, which additions are fairly appurtenant to the mortgaged property of some particular component of the consolidated corporation, these additions will be deemed covered by the underlying mortgage of that particular component, under the " after-acquired property provision " in that mortgage. Of course the nature or character of these additions may differ; it generally does. For instance, some additions are

incident and necessary to keep up the particular road, such as new rails, cross ties, depots, rolling stock and machinery; and the additions may be real estate acquired for the legitimate purposes of the particular component road, even though not built upon or developed, or actually annexed to the roadbed, or to structures enumerated in the mortgage. When the additional property, however, has been definitely allocated for use on the particular mortgaged line, either by being allocated to it in some way, or by reason of the fact that, due to the exclusive character of the property in its relationship to a given line, its use falls to that line as part and parcel of it, then the underlying mortgage will be held to cover that property.

The Steinway mortgage expresses this idea by the provision that the after-acquired property, such as car houses, machine shops and workshops, etc., shall be " convenient or necessary for use in connection " with the railroad or any part thereof.

In cases where the possessor corporation is not successor to several different roads or lines, with different underlying obligations, the question of what is convenient or necessary for use in connection with the single mortgaged road presents few difficulties. It is otherwise when the possessor corporation holds, through merger or consolidation, the lines of several original corporations, whose operative functions are suspended because of the merger of the companies into the consolidated operating corporation. In the latter case, the rule seems to be that when a particular addition, accretion or accession is made which obviously improves one only of the component roads or lines, such addition may be held to have been allocated for use on that road or line. If it cannot thus be fairly allocated to one particular line, it must be treated as the independent addition or improvement of the consolidated corporation, and as not subject to the lien of an underlying or prior mortgage of a merged component of the consolidated corporation, because not an integral part of the property covered or reached by that mortgage. (*Ithaca Trust Co.* v. *Ithaca Traction Corp.*, 248 N. Y. 322; *Metropolitan Trust Co.* v. *Chicago & E. I. R. Co.*, 253 Fed. 868; *Trust Co. of America* v. *City of Rhinelander*, 182 id. 64; *Pullman Car Co.* v. *Missouri Pacific Co.*, 115 U. S. 587; *Mississippi Valley Trust Co.* v. *Southern Trust Co.*, 261 Fed. 765; *Susquehanna Trust & Safe Deposit Co.* v. *United Tel. & Tel. Co.*, 6 F. [2d] 179.)

Taking up the Woodside car barn property, the legal title to the land which it occupies was conveyed to the New York and Queens County Railway Company by two deeds, one dated April 20, 1906, from Rudolph T. McCabe and wife, and the other dated September 3, 1907, from the Stuyvesant Real Estate Company.

McCabe's deed is confirmatory in nature. It recites a considera-tion of $1, and conveys the premises which ten years before had been conveyed to McCabe by Sophia Marc and husband by a deed reciting a consideration of $21,000. At its date, April 2, 1896, McCabe was president of the Steinway Company and the Newtown Railway Company, and was operating, under lease, the Riker Avenue, the Flushing and College Point and the Long Island City and Newton lines; and, as already said, in connection with the Philadelphia syndicate, was engaged in effecting a consolidation of these lines into a single system. This subsequently became the New York and Queens County Railway Company.

The parcel conveyed to McCabe was paid for with money fur-nished by the Philadelphia syndicate. There was a mortgage of $5,000 on the parcel which was assumed by the purchaser. The syndicate advanced $16,000. No entry of this amount was made on the Steinway books, but these books do show that the Steinway Company paid from May 27, 1896, to various persons and concerns, various sums of money on account of the Woodside car barn prop-erty, which amounts were advanced by the Philadelphia syndicate.

One Beetem was the consulting engineer of the syndicate, and he became vice-president and general manager of the new merger corporation in February, 1897. It was he who recommended that a new car barn for the system be built " as near the heart of the system " as possible, and he approved the location at Woodside and Jackson avenues, where the car barn was built.

The evidence shows that during the year ending June 30, 1897, the New York and Queens County Railway Company expended about $122,000 for " new car house — completing and making new additions to new car house at Woodside."

For the amounts which the Philadelphia syndicate advanced through it, the Steinway Company showed itself upon its books as indebted to the Philadelphia syndicate, and showed such amounts as expended by it for or upon various properties, including the car barn.

At the date of the acquisition of the land for the Woodside car barn, the Steinway Company, as to property value and cars owned and operated, was the principal part of the system of lines which became the New York and Queens County Railway Company. Its track mileage was greater than that of any other line of the system.

It did not use the Woodside barn before the merger. The barn was first used in the fall of 1896. The Steinway Company was merged September 16, 1896. The Woodside barn is not located in Long Island City, where the Steinway Company operated under

local franchises, but in Newtown, where the Steinway Company had no franchise to operate.

It cannot be contended seriously that the Steinway bondholders believed, or even thought, that the Steinway mortgage was to be a first lien on a piece of property which another corporation bought, paid for, improved and used in operating its street railway system. Their bonds recite that the plaintiff's mortgage was " a first lien upon all the lands, buildings and property of the said Railway Company [Steinway Company] and its road, franchises, rolling stock, and other equipments existing or constructed, or that said Company may hereafter obtain, acquire or construct as it is more fully set forth in said deed of trust or mortgage." There is nothing in the Steinway mortgage substantially or materially different in its expressions from what is contained in its bonds. Both mortgage and bonds show that the mortgage covered the property of the Steinway Company then owned or thereafter acquired; the grant in the mortgage is limited to the property then owned by the Steinway Company or thereafter acquired by it.

On the physical side, I fail to see any connection between the Woodside car barn and the Steinway Company. To reach the Woodside car barn, the Steinway Company would have to run tracks beyond the limits of its franchise and into the territory covered by another political subdivision. True, the distance is very slight, but the principle is not disturbed thereby.

The evidence is ample to sustain the conclusion that the Steinway mortgage is not a lien on the Woodside car barn property.

The facts of this case, to my mind, clearly show that this is not a situation within the rule permitting an apportionment of an asset. If the Steinway Company had contributed of its means to build the Woodside barn in the nature of real estate or money, it might then come within the cases cited by the learned counsel for plaintiff, appellant. But nothing of the kind is disclosed here.

It being conceded by the plaintiff, appellant, that the tracks in and about the Woodside car barn mentioned in paragraphs 1 and 2 of finding 155, and in findings 156, 157 and 158, should follow the ruling as to the Woodside car barn inasmuch as they are all necessary for access thereto or for use in connection therewith, it should be held that the lien of the Steinway mortgage does not cover these tracks.

The Purvis street substation is located in Long Island City. It is a brick building wherein alternating current is received from Manhattan. About seventy-five per cent thereof is converted therein into direct current. The legal title to the property was conveyed to the New York and Queens County Railway Company

by deed from Arthur Turnbull, dated November 27, 1906. This was about ten years after the merger. The deed was confirmatory in nature and conveyed the same premises which had been conveyed by deed dated September 17, 1906, from Katherine Pirz to Turnbull. At that time Turnbull was president of the New York and Queens County Railway Company. The construction of the building on the property was completed in March, 1908. This station is 180 feet from Jackson avenue, along which one of the Steinway lines was and is operated. It was opened for use in March, 1908. Prior thereto, the source of power for the operation of the lines of the New York and Queens County Railway Company, including the Steinway lines, was the Mill street power house, a Steinway property. About a year after the opening of the Purvis street substation, the Mill street power house was discontinued for power purposes, and thereafter the machines therein were sold for junk and were not replaced by new equipment. Based upon calculations for what was considered a reasonable period (June 1, 1922, to July 1, 1924) following the appointment of receivers of the Steinway system, an average of about sixty-three to sixty-four per cent of the current output of the Purvis street substation has been used in the operation of the Steinway lines. Since January 1, 1924, the percentage of the direct current output used in the operation of the Steinway lines has been about seventy per cent. Of the ten feeder panels in the substation, the Steinway receivers, since their appointment, have been using seven. The Steinway lines used substantially the same proportion of the direct current output of the substation, when the substation was opened for use, as they now use. According to the estimate of experts, it seems that, out of the five converters, two would be needed in winter for the operation of the Steinway lines with an additional converter to be held in reserve. It also seems that one of the converters would be more than sufficient for the operation of the lines of the New York and Queens County Railway Company, with another converter in reserve.

It is the contention of the learned counsel for plaintiff, appellant, that the substation as a whole is covered by the Steinway mortgage because within its granting clause.

It is not disputed that, for more than ten years after the merger, the New York and Queens County Railway Company operated its entire system with power from the Steinway Company's Mill street power house; that by the abandonment of this power house the Steinway lines have been deprived of their power plant; that, having elected to dismantle the Mill street power house, the New York and Queens County Railway Company rendered the Purvis street substation not only " convenient " or " necessary " for the

use of the Steinway lines, but indispensable for their use, and that the Steinway lines have no other source of power than this substation; that in view of the fact that from sixty per cent to seventy-five per cent of the capacity of the substation is used in the operation of the Steinway lines, and that without the substation they will be left without power, therefore, it is contended that the substation property should be held under the terms of the Steinway mortgage to be subject to its lien. It does not seem to be disputed that the contents of the substation should follow the ruling as to the substation.

The Purvis street substation property was purchased by the New York and Queens County Railway Company ten years after the merger of the several railroads of which it was composed. Its purchase was for the purposes of the entire railway system of the New York and Queens County Railway Company, and was in no sense a divisional addition to the Steinway lines; its location is at an eligible site, suitable for the operation of all of the lines. The taxes on the property have been paid by the New York and Queens County Railway Company.

The evidence establishes that it is not possible to sever the respective uses of the equipment in the Purvis street substation. The evidence is ample to sustain the findings and conclusions in the judgment to the effect that the Purvis street substation is not subject to the lien of the Steinway mortgage.

The real estate 7 and 9 Borden avenue and the Third street property in Long Island City are improved by an office building and a car house. The buildings upon the site were constructed after the purchase of the land and subsequent to the merger of the railroad companies.

The Steinway Company is named as the grantee in the deed to the property which was conveyed to it by Lydia E. Sears by deed dated May 6, 1896.

The steps leading up to the purchase of this property are of interest.

In April, 1896, prior to the purchase, a conference was held on the property, at which were present the engineer and certain members of the Philadelphia syndicate. The question of the handling of cars on the consolidated system was discussed, and Mr. Beetem, the syndicate's engineer, pointed out the need of a building near the Thirty-fourth street ferry to dispatch cars for the consolidated system. The purchase followed. The moneys which the syndicate paid for and expended upon the property were repaid to the syndicate out of the proceeds of the sale of the bonds issued by the New York and Queens County Railway Company.

The learned counsel for defendants, appellants, contend that there is no evidence to indicate that the Steinway Company had anything to do with the purchase of this property or even considered its purchase before the event.

The fact is that, at the time of the purchase of the Woodside car barn property, the title to that property was taken in the name of a dummy, namely, McCabe, the president of the Steinway Company, although as to that property as well as to this, the moneys that went into it came from the syndicate. Such moneys, for the greater part, were entered in the Steinway books. The testimony of McCabe shows that the title to the Woodside car barn property was taken in his name, to keep the property from coming under the Steinway mortgage. Within a short month after the Woodside purchase, this same group of men purchased the Borden avenue property, and took title to the same in the name of the Steinway Company, where the title has remained since that time, a period of about twenty-eight years.

It seems to me that the logical explanation of this difference in practice is to be found in the fact that the syndicate, at the time of the purchase, recognized that the office building and barn that it was about to build on the Borden avenue property were to be an accession or accretion to the Steinway line, and, therefore, allocated it to that line. If this is the correct explanation, the property was brought under the lien of the Steinway mortgage.

The evidence justified the conclusion of the learned trial court that the Steinway mortgage is a lien prior to the lien or interest of any of the defendants herein upon the building known as the office building (Nos. 7 and 9 Borden avenue) and the Third street car house, and the land upon which the same is erected.

The parties have agreed that if there is to be an apportionment of the miscellaneous equipment it shall be at certain stated rates.

No particular assignments of labor, equipment and materials were made to specific parts of the system. They were used indiscriminately for the whole system. The plaintiff contends that the miscellaneous equipment, materials and supplies having been acquired to keep the road a going concern, and the Steinway mortgage being a prior and underlying mortgage, the plaintiff is entitled to so much of the property as was necessary for the operation of the Steinway lines. Against this argument it is contended that, since such equipment, materials and supplies were acquired by the New York and Queens Company after the merger of the Steinway Company, such property comes under the mortgage held by the Bankers Trust Company as trustee.

The New York and Queens Company, having kept the Steinway

system a going concern, and having acquired it equipped with the necessary accessories, should be called upon to divide these accessories now that the period of unscrambling the merger has arrived. The experts have, in my opinion, stated what is a proper division of this miscellaneous property upon apportionment. The thirteenth conclusion of law should, therefore, be affirmed.

The trial court held that the Steinway mortgage was a lien upon the so-called St. Louis cars owned by the Steinway Company at the time of its merger. These cars are presently incapable of operation. The Steinway mortgage was also a lien upon forty-four steel cars owned by the New York and Queens Company at the date of the Steinway receivership, and upon the one-man safety cars to the extent to which they were purchased from the proceeds of the sale of six of said steel cars which had been sold prior to the Steinway receivership. There seems to be no dispute that the St. Louis cars are properly assignable to the Steinway, but there is a sharp dispute over the forty-four steel cars and the basis of their allocation.

The New York and Queens Company urges that the trial court erred in holding that the lien of the Steinway mortgage attaches by virtue of the after-acquired property clause therein to the forty-four cars. It points out that these cars were purchased in 1906 by the New York and Queens County Railway Company; that primarily they were intended for operation through the Belmont tunnel, and thus they were bought for a specific purpose which was not to make them a part of the equipment of the Steinway Company. The record shows no particular allocation of particular equipment to the lines. Cars were used indiscriminately, those being used which seemed best adapted to the traffic and track conditions. There was no particular number of cars for any particular lines. They did not have painted on the sides of particular cars the particular lines or avenues along which the cars ran, and the signs were interchangeable. Upon the appointment of the receiver of the Steinway lines there were temporarily assigned to the receiver enough cars to run his road. The heavy steel cars were operated very largely on the Steinway lines. They were used on the other parts of the system also. There was no distinction on account of lines at all.

I conclude that there was no special allocation of cars to the Steinway lines. The evidence is that they were interchangeably used over the entire New York and Queens Company system. These cars were purchased by the New York and Queens Company in 1906 for the Belmont tunnel. At the time of the appointment of the Steinway receiver, nineteen of these cars were assigned

to the receiver for operation of the Steinway lines. This was done without prejudice, and it is so found. There is nothing in the evidence showing that the other twenty-five steel cars were used on the Steinway lines after the receiverships. The court below has awarded the entire forty-four steel cars to the Steinway Company, holding them subject to the lien of the Steinway mortgage. The evidence that we have shows that but nineteen steel cars were actually allotted to the use of the Steinway lines, and that these were so allotted at the time of the receiverships. The trial court was in error in assigning all of the steel cars to the Steinway mortgage. It was also in error as to conclusions of law Nos. 9, 10 and 11, which sought to give to the Steinway mortgage a lien on said steel cars sold and on the proceeds of the sale, and upon the one-man safety cars that were bought with the money that came from the sale of these cars.

The judgment should, therefore, be modified by striking therefrom so much thereof as adjudges that the Steinway mortgage constitutes a valid and subsisting lien upon the forty-four steel cars Nos. 601, 602, 606, 610 and 611 to 650, inclusive, included in parcel 3, and so much thereof as directs the sale of said cars, and by inserting in place thereof a provision that the said mortgage constitutes a valid and subsisting lien upon the nineteen steel cars that were allotted to the receivers of the Steinway Company and directing the sale thereof. As so modified, the judgment should be affirmed, with costs, payable out of the proceeds of the sale, to all parties appearing and filing briefs. Findings of fact and conclusions of law inconsistent herewith are reversed and new findings and conclusions will be made.

Present — LAZANSKY, P. J., RICH, KAPPER, CARSWELL and SCUDDER, JJ.

Judgment modified by striking therefrom so much thereof as adjudges that the Steinway mortgage constitutes a valid and subsisting lien upon the forty-four steel cars Nos. 601, 602, 606, 610 and 611 to 650, inclusive, included in parcel 3, and so much thereof as directs the sale of said cars, and by inserting in place thereof a provision that the said mortgage constitutes a valid and subsisting lien upon the nineteen steel cars that were allotted to the receivers of the Steinway Company and directing the sale thereof. As so modified, the judgment is unanimously affirmed, with costs, payable out of the proceeds of the sale, to all parties appearing and filing briefs. Findings of fact and conclusions of law inconsistent herewith are reversed and new findings and conclusions will be made. Settle order on notice.